# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION AT DAYTON

EMMETT A. GRILLOT,                    :

      Plaintiff,                :
                                Case No. 3:11cv00374

 vs.                                   :
                                District Judge Thomas M. Rose

MICHAEL J. ASTRUE,                    :        Magistrate Judge Sharon L. Ovington
Commissioner of the Social
Security Administration,              :

      Defendant.                :

---

# REPORT AND RECOMMENDATIONS[1]

---

## I.    **INTRODUCTION**

Plaintiff Emmett Grillot brings this case challenging the Social Security

Administration's denial of his applications for Supplemental Security Income (SSI) and

Disability Insurance Benefits (DIB).  This Court has jurisdiction to review the

administrative denial of his applications.  *See* 42 U.S.C. §§ 405(g), 1383(c)(3).

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #9), the

Commissioner's Memorandum in Opposition (Doc. #11), Plaintiff's Reply (Doc. #12),

the administrative record (Doc. #6), and the record as a whole.

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and
Recommendations.

Plaintiff asserted in administrative proceedings that he is eligible to receive DIB and SSI because he is under a "disability" within the meaning of the Social Security Act. In the present case, Plaintiff seeks a reversal of the ALJ's decision, and a remand of this case to the Social Security Administration for payment of benefits.  The Commissioner contends that an Order affirming the ALJ's decision is warranted.

## II.    BACKGROUND

### A.    Procedural History

Plaintiff filed his SSI and DIB applications in June 2007, asserting that he has been under a "disability" since November 21, 2005.  (Doc. #6-5, *PageID##* 149-52, 153-60). Plaintiff claimed to be disabled by back problems, acid reflux disease, and poor memory. (*See* Doc. #6-6, *PageID##* 190, 214).

Following initial administrative denials of his applications, Plaintiff received a hearing before Administrative Law Judge (ALJ) Carol K. Bowen.  ALJ Bowen later issued a written decision concluding that Plaintiff was not under a disability, and, therefore, not eligible to receive DIB or SSI.  (Doc. #6-2, *PageID##* 28-42).

### B.    Plaintiff's Vocational Profile and Testimony

Plaintiff was 51 years old on the alleged disability onset date, which defined him as an individual "closely approaching advanced age."  *See* 20 C.F.R. §§ 404.1563; 416.963[2]; *see also* Doc. #6-2, *PageID#* 40,  Doc. #6-4, *PageID#* 149.  Plaintiff has a high

---

[2] The remaining citations will identify the pertinent DIB Regulations with full knowledge of the corresponding SSI/DIB Regulations.

school education, and stated he attended special education classes.  *See* 20 C.F.R. §

404.1564(b)(4); *see also* Doc. #6-6, *PageID##* 195, 220.  He has past relevant work

experience as an egg packer, a concrete vault maker, conveyor feeder off bearer, and

kitchen helper.  (*Id.* at *PageID##* 191, 216, 232-37).

Plaintiff testified at the administrative hearing[3] that he drives, but his niece brought

him to the hearing.  (Doc. #6-2, *PageID#* 58).  At the time of the hearing, he was working

three days a week as a dishwasher at Bob Evans restaurant.  (*Id.*).  Plaintiff described pain

involving his back, knees, and shoulders.  (*Id.* at *PageID# 59*).  He also described some

problems with hearing loss on his left side, mostly at night.  (*Id.* at *PageID#* 63).

He acknowledged that his medications help with pain.  (*Id.* at *PageID#* 62).  He

described his medication side effects as feeling drowsy and "looney."  (*Id.* at *PageID#*

61).  Plaintiff testified to problems with staying focused and maintaining concentration.

(*Id.* at *PageID#* 71).  Plaintiff reported that on an average day, he goes grocery shopping,

goes for a walk, or stays inside and watches television.  (*Id.* at *PageID#* 63).  His aunt or

his niece does his laundry.  (*Id.* at *PageID#* 64).  Plaintiff stated that he does household

cleaning and primarily cooks microwave meals.  (*Id.*).  Plaintiff does not read, noting he

can only read small words.  (*Id.*).  He occasionally has difficulties with dressing,

showering, bathing, and chores because of pain raising his legs.  (*Id.*).  Plaintiff stated that

he takes a nap for 30 to 60 minutes each day.  (Id. at *PageID#* 65).  His sister-in-law helps

---

[3]Because the alleged errors raised by Plaintiff do not implicate the vocational expert testimony
also presented at the administrative hearing, the Court has not summarized that testimony.

with his bills and mail.  (*Id.*).  His hobbies included building car models and drawing.  (*Id.* at *PageID#* 66).  At the time of the hearing, he was copying recipes out of a book, writing them on paper.  (*Id.*).

When cross-examined by his counsel, Plaintiff acknowledged having problems with concentration.  (*Id.* at *PageID#* 71).  When asked how long he has had problems with concentration, he responded, "it has been a while," going back to at least his last full time job in 2005.  (Id. at *PageID#* 72).

### C.    <u>Relevant Medical Opinions</u>

Giovanni Bonds, Ph.D., initially examined Plaintiff on June 26, 2006, at the request of the Bureau of Disability Determination (BDD).  (Doc. #6-7, *Page ID##* 256-64).  Dr. Bonds reported that Plaintiff required assistance completing a history form because he stated that he could not read or write.  (*Id.* at *PageID#* 256).  At the time of this evaluation, Plaintiff was living with friends.  In exchange for staying there, he was helping to take care of one of the friends, the house, and the yard.  (*Id.*).  Plaintiff stated that he graduated high school, took special education classes, and has difficulty reading, writing, and spelling.  (*Id.* at *PageID#* 257).  Plaintiff stated that he was fired from his last job because he could not do the work that was expected of him.  (*Id.* at *PageID#* 258).  Plaintiff's birth was noted to have been complicated because his head was "attached to his mother's spinal cord."  (*Id.*).

During the mental status examination, Dr. Bonds noted Plaintiff had a poor fund of knowledge with an inability to name the current president or past president, an inability to

name the months of the year, how many weeks are in a year, and the direction the sun rises, an inability to explain some similarities, and an inability to explain why people pay taxes or study history.  (*Id.* at *PageID#* 259).  Dr. Bonds also reported that Plaintiff did not show much insight or understanding of his problems and he had far below average judgment.  Dr. Bonds found that he applied his best efforts on psychological tests.  (*Id.*).  Plaintiff was found to have episodes of anger, as well as insomnia, and a poor appetite.  (*Id.* at *PageID#* 260).

On the Wechsler Adult Intelligence Scale-Third Edition (WAIS-III), Plaintiff scored a verbal IQ of 63, a performance IQ of 81, and a full-scale IQ of 69.  (*Id.* at *PageID##* 261, 264).  It was noted that his higher performance IQ was likely due to better developed visual-motor skills than auditory-vocal processing skills.  Dr. Bonds diagnosed borderline intellectual functioning and assigned Plaintiff a Global Assessment of Functioning (GAF)[4] score of 55.  (*Id.* at *PageID#* 262).

Dr. Bonds opined that Plaintiff's mental ability to relate to peers, supervisors, or the public is not significantly limited.  Dr. Bonds found him pleasant and cooperative during this evaluation.  He reportedly has friends and gets along with others in his personal life.  He reported no history of problems getting along with people when he has

---

[4]Health care clinicians perform a Global Assessment of Functioning to determine a person's psychological, social, and occupational functioning on a hypothetical continuum of mental illness.  It is, in general, a snapshot of a person's "overall psychological functioning" at or near the time of the evaluation.  *See Hash v. Comm'r of Soc. Sec.*, 309 F. App'x 981, 988 n.1 (6th Cir. 2009); *see also* Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision at pp. 32-34.  Individuals with scores of 51-60 are classified as having "moderate symptoms ... or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.* at 34.

worked. Plaintiff's mental ability to understand, remember, and follow directions is moderately limited. Plaintiff scored extremely low on the IQ and memory tests. He was observed to have problems with understanding and following directions during the testing. He also was not able to read and complete the history form without assistance and this suggests that he would have difficulty with reading and following most written instructions. Plaintiff's mental ability to maintain attention, concentration, persistence, and pace to perform simple repetitive tasks is not significantly limited. His attention and concentration were adequate. He did persist and complete the evaluation and he worked at a slow pace. Plaintiff does not report having problems in his daily life with starting and completing tasks in a timely manner. Plaintiff's mental ability to withstand the stress and pressure associated with day to day work activities is moderately limited. Because of Plaintiff's very poor judgment and reasoning abilities, his low intellectual abilities, and poor memory functioning he would have difficulties with meeting work demands for speed, accuracy, and productivity, and for responding to changes in the workplace. Dr. Bonds concluded that Plaintiff has sufficient mental ability to manage his funds. Although, he scored very low on measures of arithmetic, information, and judgment, Plaintiff does report that in his daily life he shops and handles money. (*Id.* at *PageID#* 263).

Dr. Bonds evaluated Plaintiff a second time for the Ohio BDD on April 14, 2008. (Doc. #6-7, *PageID##* 350-58). At this consultation, Plaintiff reported that he dressed himself, straightened his room, shopped at the grocery store, prepared his own meals, did

his own laundry, and was able to complete his banking with the assistance of the bank tellers.  (*Id*. at *PageID#* 354).  Dr. Bonds found that Plaintiff is able to live independently and take care of himself with the assistance of friends.  (*Id.* at *PageID#* 353).

On the WAIS-III, Plaintiff scored a verbal IQ of 59, a performance IQ of 83, and a full scale IQ of 66.  (Doc. #6-7, *PageID#* 354).  Dr. Bonds reported the current IQ scores were consistent with the previous ones.  (*Id.*).  Dr. Bonds also reported that there would be a 95% chance that on a subsequent administration of the tests, Plaintiff would have an IQ between 63 and 71.  (*Id.*).  Dr. Bond also opined that Plaintiff's verbal comprehension, expression, and reasoning skills are far below average and his immediate recall, range of factual knowledge and information, social judgment, word knowledge and conceptualization, arithmetic ability, and ability to use logical and conceptual thinking are very poor.  (*Id.*).

Dr. Bonds again diagnosed borderline intellectual functioning and assigned Plaintiff a GAF score of 55.  (Doc. #6-7, *PageID#* 356).

Dr. Bonds opined that Plaintiff's mental ability to relate to peers, supervisors, or the public is not impaired.  Plaintiff was pleasant and cooperative during the evaluation. He has some friends and generally gets along with others in his daily life.  He did not report having any problems getting along with others on his current job or any other jobs where he has worked.  (*Id.*).  Dr. Bonds found that Plaintiff's ability to understand, remember, and follow directions is moderately limited.  Plaintiff would be able to understand and follow one- and two-step directions but would have difficulty with

anything more complex.  (Doc. #6-7, *PageID#* 357).  Plaintiff's mental ability to maintain attention, concentration, persistence, and pace to perform simple repetitive tasks is not significantly limited.  He displayed adequate attention and concentration.  He persisted and completed the evaluation without taking any excessive breaks.  Plaintiff did not report having any problems in his daily life with starting and completing tasks in a timely manner.  Dr. Bonds also stated that Plaintiff's mental ability to withstand the stress and pressure associated with day-to-day work activities is moderately limited.  Because of Plaintiff's very poor judgment and reasoning abilities, low intellectual abilities and poor memory functioning he would have difficulties with work demands for speed, accuracy and productivity and for responding to changes in the workplace.  Dr. Bonds concluded that Plaintiff has sufficient mental ability to manage his funds.  Although, he scored very low on measures of arithmetic, information and judgment he does report that in his daily life he shops and handles money independently.  (*Id.*).

Tonnie Hoyle, Psy.D., a state agency psychologist, reviewed the record on behalf of the Ohio BDD on May 5, 2008.  (Doc. #6-7, *PageID##* 362-66).  Dr. Hoyle found that Plaintiff could remember locations and work procedures, complete instructions, make work decisions, and interact appropriately with the public.  (*Id.* at *PageID##* 362-63).  According to Dr. Hoyle, Plaintiff would have moderate limitations in his ability to understand, remember, and carry out detailed instructions; his ability to complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length

8

of rest periods; and, his ability to respond appropriately to changes in the work setting. (*Id.*).

Dr. Hoyle concluded that Plaintiff could perform routine, repetitive tasks in a relatively stable environment.  (*Id.* at *PageID#* 364).  Dr. Hoyle opined: "Claimant is not eligible for 12.05 Grant.  He does not display the developmental onset requirement. His Adaptive Function also does not demonstrate the required deficits.  The current IQ scores are within the Standard Error of Measure of 2006 scores, therefore cannot be used to evidence worsening.  Both 2006 and current CE [consultive examination] gave BIF dx [borderline intellectual functioning diagnosis]."  (*Id.* at *PageID#* 366).

Dr. Hoyle also completed a Psychiatric Review Technique wherein she opined Plaintiff had mild limitations in his activities of daily living and in maintaining social functioning but moderate limitations in his ability to maintain concentration, persistence, or pace.  (*Id.* at *PageID##* 367-80).

## III.    ADMINISTRATIVE REVIEW

### A.    "Disability" Defined

To be eligible for SSI or DIB a claimant must be under a "disability" within the definition of the Social Security Act.  *See* 42 U.S.C. §§ 423(a), (d), 1382c(a).  The definition of the term "disability" is essentially the same for both DIB and SSI.  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).  A "disability" consists only of physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in

9

"substantial gainful activity" that is available in the regional or national economies.  *See Bowen*, 476 U.S. at 469-70.

A DIB/SSI applicant bears the ultimate burden of establishing that he or she is under a disability. *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

### B.  Social Security Regulations

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence; *see* Doc. #6-2, *PageID##* 29-30; *see also* 20 C.F.R. § 404.1520(a)(4).  Although a dispositive finding at any Step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.  Is the claimant engaged in substantial gainful activity?

2.  Does the claimant suffer from one or more severe impairments?

3.  Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4.  Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5.  Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279

F.3d 348, 354 (6th Cir. 2001).

### C.    ALJ Bowen's Decision

At Step 1 of the sequential evaluation, ALJ Bowen found that Plaintiff has not engaged in substantial gainful activity since November 21, 2005, the alleged onset date. (Doc. #6-2, *PageID#* 31).

The ALJ found at Step 2 that Plaintiff has the severe impairments of lumbar degenerative disc disease; history of syncope; and borderline intellectual functioning. (*Id.*).

The ALJ determined at Step 3 that Plaintiff does not have an impairment or combination of impairments that meet or equal the level of severity described in Appendix 1, Subpart P, Regulations No. 4. (Doc. #6-2, *PageID#* 32).

At Step 4, the ALJ concluded that Plaintiff retained the residual functional capacity[5] (RFC) to perform medium exertional work subject to the following additional limitations: no operation of foot controls with the left lower extremity; no overhead reaching; no climbing ladders, ropes, or scaffolding; no driving; no unprotected heights or hazardous machinery. (Doc. #6-2, *PageID#* 35). The ALJ found that Plaintiff would be mentally limited to work with 1-2 step tasks with few, if any, changes in work-setting; no strict time standards or demands for a production rate pace; restricted to work that does not require reading skills; no loud or very loud work environments. (*Id.*).

---

[5] The claimant's "residual functional capacity" is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations. 20 C.F.R. §404.1545(a); *see Howard v. Comm'r of Social Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

The ALJ concluded at Step 4 that Plaintiff was unable to perform his past relevant work as an egg packer, concrete vault maker, conveyor feeder off bearer, and kitchen helper.  (Doc. #6-2, *PageID#* 40).

At Step 5, based on the vocational expert's testimony, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Plaintiff could perform given his age, education, work experience, and RFC.  (Doc. #6-2, *PageID#* 41).

The ALJ's findings throughout her sequential evaluation led her to ultimately conclude that Plaintiff was not under a disability and was therefore not eligible for DIB or SSI.  (Doc. #6-2, *PageID#* 42).

## IV.  <u>JUDICIAL REVIEW</u>

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r. of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r. of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings.  *Rogers v. Comm'r. of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).  Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (*quoting Warner v. Comm'r*

*of Social Security*, 375 F.3d 387, 390 (6th Cir. 2004)).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry – reviewing for correctness the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings.  *Rabbers v. Comm'r. of Social Security*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746.  "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746 and citing *Wilson v. Comm'r. of Social Security*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V.    DISCUSSION

### A.    Plaintiff's Contentions

Plaintiff argues he meets the criteria for disability set forth in Listing § 12.05(B) and (C), and the ALJ's decision to the contrary is "fatally flawed."  Specifically, Plaintiff argues the ALJ erred by invalidating his IQ scores based on his activities and level of functioning, including his ability to work part-time and care for himself.  (Doc. #9, *PageID#* 523).  Plaintiff also argues the ALJ incorrectly concluded that he did not present sufficient evidence regarding special education classes he took while in high school to satisfy the diagnostic description in the introductory paragraph of Listing § 12.05, and

13

that she erred by failing to consider his "severe" physical impairments of lumbar

degenerative disc disease and history of syncope when evaluating whether he met Listing

§ 12.05(B) and (C). (*Id.*, *PageID#* 525).

**B.**     **Listing § 12.05(B) & (C)**

The Regulations explain the criteria for mental retardation in § 12.05 of the

Listings:

> The structure of the listing for mental retardation (12.05) is different from
> that of the other mental disorders listings.  Listing 12.05 contains an
> introductory paragraph with the diagnostic description for mental
> retardation.  It also contains four sets of criteria (paragraphs A through D).
>
> If your impairment satisfies the diagnostic description in the introductory
> paragraph and any one of the four sets of criteria, we will find that your
> impairment meets the listing.  Paragraphs A and B contain criteria that
> describe disorders we consider severe enough to prevent your doing any
> gainful activity without any additional assessment of functional
> limitations.  For paragraph C, we will assess the degree of functional
> limitation the additional impairment(s) imposes to determine if it
> significantly limits your physical or mental ability to do basic work
> activities, i.e., is a "severe" impairment(s), as defined in §§ 404.1520(c) and
> 416.920(c).  If the additional impairment(s) does not cause limitations that
> are "severe" as defined in §§ 404.1520(c) and 416.920(c), we will not find
> that the additional impairment(s) imposes "an additional and significant
> work-related limitation of function," even if you are unable to do your
> past work because of the unique features of that work.  Paragraph D
> contains the same functional criteria that are required under paragraph B
> of the other mental disorders listings.
>
> 12.05  Mental retardation: Mental retardation refers to significantly
> subaverage general intellectual functioning with deficits in adaptive
> functioning initially manifested during the developmental period; i.e., the
> evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the
> requirements in A, B, C, or D are satisfied.

14

. . .

B. A valid verbal, performance, or full scale IQ of 59 or less;

OR

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function . . . .

The regulations provide that a claimant will meet the listing for mental retardation only "[i]f [the claimant's] impairment satisfies the diagnostic description in the introductory paragraph and one of the four sets of criteria...." *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001) (citations omitted).  "In other words, to demonstrate mental retardation, a claimant must demonstrate three factors to satisfy the diagnostic description: (1) subaverage intellectual functioning; (2) onset before age twenty-two; and (3) adaptive-skills limitations," in addition to qualifying under one of the four sets of criteria under Section 12.05.  *Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x 672, 675 (6th Cir. 2009).

**C.    Analysis**

In this case, Plaintiff completed two Wechsler Adult Intelligence Scale-Third Edition (WAIS-III) tests, both administered by Dr. Bonds.  On the first test, administered on June 26, 2006, Plaintiff obtained a verbal IQ score of 63, a performance IQ score of 81, and a full scale IQ score of 69.  (Doc. #6-7, *PageID#* 261).  After the first administration, Dr. Bonds noted "[c]hances are 95 out of 100 that upon subsequent administrations of this test, [claimant] would validly obtain a Full Scale IQ between 66

15

and 74." (*Id.*).  In fact, on the subsequent test, administered on April 14, 2008, Plaintiff

did score within the full scale IQ score range of 66 to 74 predicted by Dr. Bonds: he

obtained a full scale IQ score of 66.  (*Id.* at *PageID#* 354).  Plaintiff also obtained a

verbal IQ score of 59, and a performance IQ score of 83.  After the second administration,

Dr. Bonds indicated "[c]hances are 95 out of 100 that upon subsequent administrations of

this test, [claimant] would validly obtain a Full Scale IQ between 63 and 71," and noted

his "current scores are consistent with his previous ones."  (*Id.*).

　　　In her decision, the ALJ concluded the requirements in paragraph B of Listing §

12.05 were not met because Plaintiff did not have a valid verbal, performance, or full

scale IQ of 59 or less.  Specifically, the ALJ found the following:

> Turning to the requirements in paragraph B, they are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 59 or less. Examining psychologist, Dr. Bonds, tested the claimant on April 14, 2008, and found that he had a verbal IQ of 59, a performance IQ of 83, full scale IQ of 66, stating that, in her opinion, there would be a 95% chance that on a subsequent administration of the tests the claimant would have an IQ between 63 and 71 (Exhibit 10F at 5). She stated that the claimant's immediate recall, range of factual knowledge and information, social judgment, word knowledge and conceptualization, arithmetic ability, and ability to use logical and conceptual thinking are all poor (Exhibit 10F at 5). However, as noted above, Dr. Bonds is aware that the claimant lives alone and takes care of himself and she stated that the claimant would be able to understand and follow one- and two-step directions (Exhibit 10F at 2). Further, an evaluating psychologist found that the claimant has the ability to remember locations and work procedures, complete instructions, make work decisions, and interact appropriately with the public (Exhibit 11F at 1-2). The claimant testified to currently working part-time, something which necessitates organizational skills, ability to follow a routine, and the ability to interact with co-workers. The IQ scores identified by Dr. Bonds are not consistent with the claimant's high level of functioning. Therefore, it is found that the IQ test scores found by Dr. Bonds are not valid. The claimant testified that he had special education classes in reading and writing; however there is no evidence in the

16

record to substantiate that statement.  Therefore, it is found that the requirements of paragraph B have not been met.

(Doc. #6-2, *PageID#* 33).  The ALJ further determined that Plaintiff also did not satisfy the requirements in paragraph C of Listing § 12.05:

> In terms of the requirements in paragraph C, they are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.  As noted above, the IQ scores found by Dr. Bonds are not a valid reflection of claimant's functioning and there is no evidence that the claimant went through special education classes.  Further, the claimant does not have any other mental impairment (see Finding No. 3).  Therefore, it is found that the requirements of paragraph C are not met.

(Id., *PageID#* 34).  Despite the consistent results of two IQ tests, and absent any indication from Dr. Bonds that such results were not valid or otherwise were the result of bad faith or malingering by the Plaintiff, the ALJ determined "the IQ test scores found by Dr. Bonds are not valid" because such scores "are not consistent with the claimant's high level of functioning."  (Id., *PageID#* 33).  This finding, however, is not supported by substantial evidence.

The ALJ's decision to invalidate Plaintiff's IQ test scores is based on the fact he was appropriately groomed, is able to dress himself, can straighten his room, goes grocery shopping, prepares his own meals, does his own laundry, is able to go to the bank with the assistance of bank tellers, is able to live independently, is able to care for himself with the assistance of friends, and can understand and follow one- and two-step directions.  The ALJ also noted that "an evaluating psychologist found that the claimant has the ability to remember locations and work procedures, complete instructions, make work decisions,

and interact appropriately with the public," and that "the claimant testified to currently working part-time, something which necessitates organizational skills, ability to follow a routine, and the ability to interact with co-workers." *Id.* As discussed below, however, such reasons are not sufficient to invalidate IQ test scores.

In *Brown v. Sec'y of Health & Human Servs.*, the United States Court of Appeals for the Sixth Circuit determined the plaintiff, Mr. Brown's, IQ score of 68 to be valid and his abilities to be within the DSM-III-R's [6] diagnosis of mild mental retardation corresponding to an IQ between 50-55 and 70. The Court of Appeals explained:

> Mr. Brown is able to use public transit; he has a driver's license; he visits friends; he is able to make change at the grocery store; he can do his own laundry and clean his room; he has completed the sixth grade; he has a limited level of reading comprehension (Mr. Brown stated that he can follow a road atlas, and a friend testified she had seen him reading a newspaper); and as a truck driver, Mr. Brown recorded mileage, the hours he worked, and the places he drove.

*Brown v. Sec'y of Health & Human Servs.*, 948 F.2d 268, 269-70 (6th Cir. 1991). The Court of Appeals further explained that individuals with mild mental retardation

> [b]y their late teens . . . can acquire academic skills up to approximately sixth-grade level; during their adult years, they usually achieve social and vocational skills adequate for minimum self-support, but may need guidance and assistance when under unusual social or economic stress. At the present time, virtually all people with Mild Mental Retardation can live successfully in the community, independently or in supervised apartments or group homes (unless there is an associated disorder that makes this impossible).

*Brown*, 948 F.2d at 270 (quoting DSM-III-R § 317.00).

---

[6] Diagnostic and Statistical Manual of Mental Disorders, 3rd ed., Revised

More recently, in *Dragon v. Comm'r of Soc. Sec.*, 470 F. App'x 454, 462 (6th Cir. 2012), the Court of Appeals again considered the appropriateness of invalidating IQ test scores based on an ALJ's assessment that such scores are inconsistent with the claimant's level of functioning. In *Dragon*, plaintiff-appellant Rose Dragon was able to go grocery shopping, care for her daughter, do laundry, and clean dishes. *Dragon*, 470 F. App'x at 455. She had a high school education (completed through special education classes), and attempted to work a number of jobs, including dishwasher, bagger at a grocery store, and fast-food worker. *Id.* Dragon's school records indicate she took a Wechsler Intelligence Scale for Child-Third Edition (WISC-III) test at the age of 12, and received a verbal scale IQ score of 65, a performance scale IQ of 72, and a full scale IQ of 66. These records also indicated Dragon did not pass any ninth grade proficiency tests (and was later exempted from doing so due to her lack of skills to pass), graduated high school after completing her requirements during the summer, was fairly successful in her classes, took regular curriculum with study skills for support, and obtained credits for work-study. *Id.*

In July 2004, Dragon took a Wechsler Adult Intelligence Scale-Third Edition test. She obtained a verbal IQ score of 58, a performance scale IQ score of 51, and a full scale IQ score of 50. These results indicated she was functioning "in the 'moderately retarded range of intelligence or at least well less than the percentile for [her] age group." *Id.* The clinical psychologist who administered the test, Dr. Paul Deardorff, stated her "'tested I.Q. is lower than would be expected on the basis of clinical presentation. Emotional and motivational factors may have interfered with performance on this measure as [she]

19

appears to be of borderline intelligence.'" In his multiaxial classification of Dragon, Dr.

Deardorff classified her as "borderline intellectual functioning" on Axis II, and on Axis V

gave her a GAF score of 55.  Later, a state agency psychologist, Dr. Douglas Pawlarczyk,

"largely reiterated Dr. Deardorff's findings of Dragon's functional capacity," but noted

"in particular, that '[Dr. Deardorff] felt that [Dragon's I.Q. scores] may be an

underestimate as [Dragon] clinically presented as more in the [borderline intellectual

functioning] range. Those school age score [sic] are more likely an [sic] true estimate of

her intellectual ability.'" *Id.* at 457 (brackets in original).

Subsequently, in May 2006, the ALJ concluded Dragon was not disabled, was able

to perform past work, and not entitled to SSI.  *Id.* at 458.  At Step 3, the ALJ found the

following:

> The ALJ again noted that Dragon is 'of borderline intelligence and is not mentally
> retarded." The ALJ specifically rejected a portion of Dr. Deardorff's analysis:
> 'The I.Q. scores obtained by Dr. Deardorff were felt to be underestimates of the
> claimant's intellectual functioning and therefore are not valid.' The ALJ
> referenced I.Q. scores in the mid-60s obtained while Dragon was a child but failed
> to consider the scores because the testing 'is not actually contained in the file to
> assess whether the results were considered to be valid.'  The ALJ then went on to
> note that Dragon's high school education was not consistent with mental
> retardation.  The ALJ concluded his third step analysis as follows: 'There is very
> little to no substantive indication that the claimant has a history of deficits in
> adaptive functioning initially manifested during the developmental period to the
> attainment of age 22."

*Id.* at 458.  The ALJ ultimately denied Dragon's claim for SSI, and the district court

affirmed.  *Id.* at 459.  The Court of Appeals subsequently reversed and remanded for an

immediate award of benefits.  *Id.* at 467.  The Court of Appeals noted that "[t]he ALJ

20

ignored the wealth of evidence in support of Dragon's claims and affirmatively found otherwise." *Id.* at 459.

Regarding the ALJ's finding that Dragon's IQ test scores from 2004 were not valid, the Court of Appeals held that such a conclusion was not supported by substantial evidence. *Id.* at 461-62. The Court first noted that Dr. Deardorff opined that Dragon "did not appear to exaggerate or minimize her difficulties . . . [and] was adequately motivated," yet the ALJ improperly ignored such an observation. *Id.* at 461. The Court of Appeals also found the ALJ's conclusion that Dragon's IQ test score from 2004 was lower than expected – and therefore completely invalid based on this point – was not supported by substantial evidence. *Id.* at 462. Likewise, the Court of Appeals determined that the fact Dragon was a high school graduate (with special education classes) and a mother, could not be held against her. *Id.* Accordingly, the Court of Appeals held that "[b]ecause Dragon's activities are not inconsistent with her tested I.Q. scores and Dragon's performance during Dr. Deardorff's evaluation was not inconsistent with her test I.Q. scores, the ALJ's decision to invalidate the I.Q. scores was not supported by substantial evidence." *Id.* at 463.

As discussed in *Brown*, and reiterated recently in *Dragon*, the fact an individual is able to live successfully in the community and possesses the skills necessary for minimum self-support does not preclude a diagnosis of mild mental retardation, nor does it support invalidating corresponding IQ scores of 70 or below. It was therefore improper for the ALJ in this case to rely on Plaintiff's similar level of skills and abilities as

justification for invalidating his IQ test scores.  Furthermore, the ALJ appears to have either misunderstood, or misconstrued, the statement by Dr. Bonds that there would be a 95% chance on a subsequent administration of the test that the claimant would achieve a full scale IQ between 63 and 71.  The significant weight afforded by the ALJ to such a statement is likewise improper, and provides no support for invalidating the scores.

Importantly, Dr. Bonds' statement relates only to her prediction regarding Plaintiff's full scale IQ score on a subsequent administration of the test – it provides little insight into the breakdown of Plaintiff's verbal IQ or performance IQ scores on a future test. Thus, even if Plaintiff were to score higher on a subsequent full scale IQ score, there is no indication he would necessarily also score higher on the verbal IQ section.  Rather, a hypothetical increased full scale IQ score could be achieved solely on an improved performance IQ score, with the verbal IQ score unchanged.  As paragraph B of Listing § 12.05 only requires a valid verbal, performance, **or** full scale IQ of 59 or less, it is entirely possible that Plaintiff could achieve a higher full scale IQ score on a subsequent examination yet also obtain another verbal IQ score of 59, or even less, and still satisfy this requirement of paragraph B in Listing § 12.05.  Furthermore, while the ALJ appears to have provided significant weight to Dr. Bonds' statement indicating Plaintiff may achieve a higher full scale IQ score on a subsequent test, Dr. Bonds' statement likewise indicates that Plaintiff has a 95% chance of achieving a <u>lower</u> full scale IQ score on a subsequent test.  This point, however, the ALJ does not appear to have considered.

Plaintiff achieved a full scale IQ score in April 2008 of 66.  Dr. Bonds' indicated there is a 95% chance on a subsequent test Plaintiff would achieve a full scale IQ score in the range of 63 and 71.  When viewed in combination with Plaintiff's first IQ test scores (verbal IQ score of 63, performance IQ score of 81, and full scale IQ score of 69), Dr. Bonds' statement regarding Plaintiff's expected results on a subsequent – third – IQ test actually tends to support quite the opposite conclusion than that reached by the ALJ: the IQ scores are valid.

In *Brown*, the Court noted that "the Secretary could have administered a second I.Q. test were he certain of the invalidity of Mr. Brown's scores. He did not." *Brown*, 948 F.2d at 270.  Here, Plaintiff took two IQ tests within two years, both administered by the same examining psychologist, and both resulting in similar scores.  Furthermore, after the second IQ test, the same examining psychologist indicated there existed a 95% chance Plaintiff would, yet again, achieve similar results on a third administration of the test. Despite these facts, the ALJ found the second set of IQ test scores invalid (and also appears to have invalidated the first set of scores or otherwise completely overlooked them).  Such a conclusion, however, is not supported by substantial evidence.  To conclude otherwise would permit an ALJ to invalidate IQ test scores on the flimsiest of rationales and call into question what purpose IQ testing truly serves in such cases.  The Court in *Brown* made abundantly clear that individuals with mild mental retardation "can live successfully in the community, independently or in supervised apartments or group homes . . . ." *Brown*, 948 F.2d at 270.  Thus, invalidating a claimant's IQ scores that are

23

within the range consistent with a diagnosis of mild mental retardation based on that

individual's ability to live successfully in the community – something individuals with

mild mental retardation are capable of doing – is simply misguided.  *See id.*  That is not to

say, however, that IQ test scores can never be invalidated.  Evidence of bad faith or

malingering by the claimant would certainly be one reason sufficient to invalidate IQ test

scores. *See Shepherd v. Sullivan*, 889 F.2d 1088, *3 (6th Cir. 1989).

Furthermore, it is important to remember that IQ scores merely define an

individual's general intellectual functioning.  They do not, however, conclusively

determine whether an individual should, or should not, be diagnosed with mental

retardation.  *See* American Psychiatric Association, Diagnostic and Statistical Manual of

Mental Disorders, 41-42 (4th edition text revision 1994) (DSM-IV-TR) ("[I]t is possible

to diagnose Mental Retardation in individuals with IQs between 70 and 75 who exhibit

significant deficits in adaptive behavior.  Conversely, Mental Retardation would not be

diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or

impairments in adaptive function.").  Accordingly, an ALJ should likewise refrain from

calling into question the validity of IQ test scores of 70 and below simply because the

claimant is diagnosed with borderline intellectual functioning or appears to function at a

level above that of a person with mild mental retardation.  In fact, the validity of a

claimant's IQ test scores is largely irrelevant if an ALJ determines that, even considering

such scores, the claimant does not meet the diagnostic description set forth in the

introductory paragraph of Listing § 12.05.  *See Courter v. Comm'r of Soc. Sec.*, 2012 U.S.

24

App. LEXIS 9372 at *22 (6th Cir. 2012) ("The mere fact of a qualifying IQ score does not require that the ALJ find mental retardation under Section 12.05B when substantial evidence supports the contrary conclusion or the claimant's allegations of her capabilities are deemed not credible." (citation omitted)); *see also Cooper v. Comm'r of Soc. Sec.*, 217 F. App'x 450, 452 (6th Cir. 2007) ("Yet, it is not enough for a claimant to point to one IQ score below 71; the claimant must also satisfy the 'diagnostic description' of mental retardation in Listing 12.05. It is undisputed that no psychologist has diagnosed Cooper with mental retardation. The examiner and clinical psychologist who tested him diagnosed him instead as borderline intellectual functioning." (internal citations omitted)).

For example, in *Daniels v. Comm'r of Soc. Sec.*, 70 F. App'x 868 (6th Cir. 2003), the plaintiff-appellant obtained a WAIS-R performance IQ of 67, but was nonetheless determined not to be mentally retarded by the ALJ because the record indicated that she functioned at a level exceeding her test score. *Id.* at 872 ("In other words, the record indicates no findings that Plaintiff suffered from 'significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period.'" (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05)). "Adaptive functioning includes a claimant's effectiveness in areas such as social skills, communication, and daily living skills." *West v. Comm'r of Soc. Sec.*, 240 F. App'x 692, 698 (6th Cir. 2007) (citing *Heller v. Doe by Doe*, 509 U.S. 312, 329, 113 S. Ct. 2637, 125 L. Ed. 2d 257 (1993)); *see also* DSM-IV-TR at 39-42 ("Impairments in adaptive

25

functioning, rather than a low IQ, are usually presenting symptoms in individuals with Mental Retardation. . . . Problems in adaptation are more likely to improve with remedial efforts than is the cognitive IQ, which tends to remain a more stable attribute.").

The Court in *Daniels* noted that the plaintiff graduated from high school with a vocational education, "earned a cosmetology license, and possesses prior work experience in a movie theater, as a hair stylist, and as a school bus driver; i.e., her educational background and work experience demonstrate an 'ability to perform relatively complicated tasks.'" *Id.* at 872-73 (quoting *Foster*, 279 F.3d at 355).  Likewise, the plaintiff did "not provide[] any evidence, as required, that her mental deficiency initially manifested before age 22."  *Id.* at 873.  Thus, the ALJ in *Daniels* properly found the plaintiff was not mentally retarded because she failed to meet the diagnostic description of mental retardation in the introductory paragraph of Listing § 12.05, not because she failed to have a valid IQ test score.

Turning to the facts in this case, the Court finds the ALJ erred by invalidating the IQ test scores from April 2008.  To the extent the ALJ also intended to invalidate the IQ test scores from June 2006, and did not simply overlook them, she also erred.  Yet, as previously discussed, Plaintiff's valid IQ test scores do not alone satisfy the requirements of Listing § 12.05(B) or (C).  Plaintiff must also meet the diagnostic description of mental retardation in the introductory paragraph of Listing § 12.05.  At Step 3, the ALJ noted that "[t]he claimant's mental impairment has been considered under the requirements of listing 12.05," but determined Plaintiff did not meet or equal such listing.  Plaintiff

contends the ALJ erred in making such a determination, specifically as it relates to paragraphs B and C of Listing § 12.05.

The ALJ noted that "[m]ental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." (Doc. #6-2, *PageID#* 32). She then proceeded to analyze whether the requirements of each paragraph in Listing § 12.05 had been satisfied. As to the requirements in paragraph B, the ALJ incorrectly determined the claimant did not have a valid verbal, performance, or full scale IQ of 59 or less. Nonetheless, she correctly noted that "[t]he claimant testified that he had special education classes in reading and writing; however there is no evidence in the record to substantiate that statement." *Id.* at *PageID#* 33. This statement is significant because it indicates the ALJ also considered whether Plaintiff met the diagnostic description of mental retardation set forth in the introductory paragraph of Listing § 12.05 – specifically as it relates to the manifestation of deficits in adaptive functioning before age 22 – and determined he did not. Substantial evidence supports this conclusion. Furthermore, because the ALJ's finding that Plaintiff does not meet or equal the diagnostic description set forth in the introductory paragraph of Listing § 12.05 precludes Plaintiff from being able to satisfy requirements under any paragraph of Listing § 12.05, the ALJ's incorrect invalidation of Plaintiff's IQ test scores is harmless error. *See Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009).

27

Plaintiff argues his "testimony and medical records make repeated reference to his enrollment in special education [classes]," and "[t]here was no reason to doubt the validity of this evidence and the ALJ fail[ed] to cite anything to contradict it."  (Doc. # 9, *PageID# 524* (citing to Doc. 6-2, *PageID#* 58 and Doc. # 6-7, *PageID#* 257)).  Yet while it is true Plaintiff testified he was in special education classes, and this point was noted on his psychological evaluation completed by Dr. Bonds, no school records or other evidence was provided to the ALJ to substantiate these statements.  Thus, even accepting Plaintiff's testimony as true that he was in special education classes, the ALJ would not have necessarily been able to determine from such testimony alone whether deficits in adaptive functioning began before the age of 22.  Just as the fact a claimant was not enrolled in special education classes does not necessarily preclude him or her from being able to show through other evidence an onset of deficits in adaptive functioning before the age of 22, nor would the fact a claimant was enrolled in special education classes conclusively <u>establish</u> the onset of such deficits before age 22.  For example, when considering if enrollment in special education classes is sufficient to show whether a claimant's deficits in adaptive functioning began before the age of 22, an ALJ may wish to consider other details that may be included in the school records, such as whether the claimant's education comprised entirely of special education classes or merely one or two, the curriculum or grade level of special education classes the claimant completed, or whether enrollment in such classes was due primarily to mental impairments or because of motivational factors or absenteeism.  *See, e.g., Courter*, 2012 U.S. App. LEXIS 9372

28

at *8 (Claimant's school records included an assessment from the school psychologist indicating "there is some question as to how much of a true 'slow learner' [Claimant] is, as the combination of an unsettled home environment and poor attendance would not be conducive to helping [her] perform as well as she might if these inhibiting factors were not present.").  In this case, Plaintiff did not present any school records or other evidence to the ALJ regarding deficits in adaptive functioning that began before the age of 22.  The ALJ's mention of such a fact was not incorrect.

Plaintiff further argues that "any perceived deficiency by the ALJ should have triggered her duty to develop the record and obtain evidence regarding Mr. Grillot's educational status."  (Doc. #9, *Page ID#524*).  This argument, however, is unpersuasive. "Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case.  The ALJ's duty to develop the record extends even to cases . . . where an attorney represented the claimant at the administrative hearing."  *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004); *see Wright-Hines v. Comm'r of Soc. Sec.*, 597 F.3d 392, 396 (6th Cir. 2010) ("the ALJ has an inquisitorial duty to seek clarification on material facts."); *see also Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1051 (6th Cir. 1983) ("Subsequent appellate court development of the *Perales* doctrine [*Richardson v. Perales*, 402 U.S. 389 (1971)] has emphasized the remedial purpose of the authorizing legislation and the duty of the administrative law judge to fully develop the record."); *Vaca v. Comm'r of Soc. Sec.*, 2010 WL 821656 *5 (W.D. Mich., Mar. 4, 2010) ("the ALJ has an affirmative duty

to develop the factual record upon which his decision rests, regardless of whether or not the claimant is represented.").

In the present case, Plaintiff was represented by counsel during the ALJ's hearing. Consequently, the ALJ's basic duty to fully and fairly develop the record – although it remained in place, *e.g.*, *Wright-Hines*, 597 F.3d at 396 – did not rise to the heightened duty to develop the record applicable when a claimant appears during social security proceedings without an attorney or representative. *See Lashley*, 708 F.2d at 1051-52. In both circumstances, "[t]here is no bright line test for determining when the administrative law judge has . . . failed to fully develop the record. The determination in each case must be made on a case by case basis." *Lashley*, 708 F.2d at 1052. "The duty to develop the record...is balanced with the fact that '[t]he burden of providing a complete record, defined as evidence complete and detailed enough to enable the Secretary to make a disability determination, rests with the claimant.'" *Landsaw v. Sec'y of Health & Human Servs.*, 803 F2d 211, 213 (6th Cir. 1986)(citing 20 C.F.R. §§ 416.912, 416.913(d)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999)(claimant's burden to prove disability). An overall reading of the hearing testimony demonstrates that the ALJ appropriately questioned Plaintiff about the conditions Plaintiff believed prevented him from working. The ALJ did not, however, have the duty to seek to obtain Plaintiff's school records or inform counsel of such a deficiency.

Moreover, the Court notes that even if Plaintiff provided records capable of showing deficits in adaptive functioning before the age of 22, substantial evidence would

still support the ALJ's conclusion Plaintiff does not meet the remaining requirements set forth in the diagnostic description of mental retardation in Listing § 12.05.  The ALJ also properly considered Plaintiff's work history in determining that he did not have the adaptive deficits required to be considered mentally retarded under Listing § 1205(B) and (C).  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00D ("Information concerning the individual's behavior during any attempt to work and the circumstances surrounding termination of the work effort are particularly useful in determining the individual's ability or inability to function in a work setting.").  Likewise, the ALJ properly considered the fact that Dr. Hoyle reviewed Plaintiff's file and concluded that Plaintiff had mild limitations in his activities of daily living and in maintaining social functioning (Doc. # 6-2, *PageID#* 35) and could perform routine, repetitive tasks in a relatively stable environment.  (Doc. #6-7, *PageID#* 364).  The ALJ properly found that the medical record as a whole was consistent with the opinions of Drs. Bond and Hoyle and gave their assessments significant weight.  (Doc. # 6-2, *PageID#* 35).  The ALJ reasonably adopted Dr. Hoyle's recommended non-exertional limitations because they are consistent with the evidence of record.  (Doc. # 6-2, *PageID#* 38).  *See* 20 C.F.R. § 404.1527(e)(2)(i) (State agency consultants are "highly qualified physicians and psychologists who are also experts in Social Security disability evaluation.").  The Court finds that substantial evidence supports the ALJ's reliance on Dr. Hoyle, who notably found that Plaintiff's impairments did not meet or equal Listing 12.05(B) or (C).  (Doc. # 6-7, *PageID#* 366).

Accordingly, the Court finds that substantial evidence supports the ALJ's finding that Plaintiff's impairments do not meet or equal Listing § 12.05.  The ALJ's decision should therefore be affirmed.  *See Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) ("If substantial evidence supports the Commissioner's decision, this Court will defer to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion.")

## IT IS THEREFORE RECOMMENDED THAT:

1.     The Commissioner's final non-disability decision be affirmed; and

2.     The case be terminated on the docket of this Court.


November 13, 2012                                   s/Sharon L. Ovington
                                                  Sharon L. Ovington
                                              United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen (14) days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen (17) days because this Report isOctober 29, 2012 being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. See, United States v. Walters, 638 F. 2d 947 (6th Cir. 1981); Thomas v. Arn, 474 U.S. 140 (1985).